**WO**

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Ian Elliot Anderson, | No. CV-19-00743-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Intel Corporation, | |
| Defendant. | |

Pending before the Court is Defendant Intel Corporation's ("Intel") motion for summary judgment, which is opposed by *pro se* Plaintiff Ian Elliot Anderson ("Anderson").  For the following reasons, Intel's motion is granted in part and denied in part and Intel is granted leave to file a successive summary judgment motion as to Anderson's sole remaining claim.

## BACKGROUND

I.    Factual Background

The facts below are derived from the parties' summary judgment submissions, with all conflicts resolved in the favor of Anderson, the non-movant.

Anderson is a Jamaican immigrant who became a naturalized United States citizen in 2000.  (Doc. 52-1 ¶ 3.)  He began working for Intel as a manufacturing technician in 2001.  (Doc. 44-2 ¶ 2; Doc. 52-1 ¶¶ 4, 71.)

In or around April 2013, Anderson transferred to Intel's chip factory in Chandler, Arizona, known as Fab 32.  (Doc. 44-2 ¶ 3; Doc. 52-1 ¶ 7.)  From the time Anderson started

1    working for Intel until his transfer to Fab 32, he "experienced no workplace discrimination
2    nor any serious workplace issues while under Intel's employ."  (Doc. 52-1 ¶ 5.)

3        A.    **Workplace Environment In Fab 32**

4            1.    Hoffman Supervision

5    Kathleen Hoffman ("Hoffman") initially served as Anderson's Fab 32 supervisor.
6    (Doc. 44-2 ¶ 4; Doc. 52-1 ¶ 8.)  Anderson states that Hoffman became his supervisor soon
7    after he received notice of his impending transfer to Fab32.   (Doc. 52-1 ¶ 7.)   After
8    Hoffman became Anderson's supervisor but before Anderson actually transferred to Fab
9    32, another employee told Anderson to "watch out because Hoffman had it out" for him.
10   (*Id.* ¶ 9.)  A coworker later told Anderson that Hoffman had referred to him as a "lazy
11   Jamaican."  (*Id.* ¶ 11; Doc. 44-1 at 17, lines 3-15.)

12   According to Anderson, "[f]or the entire first year of [his] Fab32 placement, [he]
13   endured relentless and cruel workplace harassment, bullying and name-calling by [his]
14   cohorts, which included . . . epithets such as 'Jamaican Jerk' and 'Chocolate Waterfall,'
15   most of which were based on Hoffman's Jamaican stereotype."  (Doc. 52-1 ¶ 13.)

16           2.    DeFrancis Supervision

17   Paul DeFrancis ("DeFrancis") replaced Hoffman as Anderson's supervisor in June
18   2013 and continued serving in that capacity until Anderson's employment with Intel ended
19   in October 2016.  (Doc. 44-2 ¶ 4; Doc. 52-1 ¶ 8.)

20   On May 14, 2014, Anderson sent an email to DeFrancis concerning the Fab 32 work
21   environment.  (Doc. 44-1 at 88-91.)  Anderson reported, among other things, that: (1) his
22   coworkers made fun of him for his frequent bathroom breaks, which, unbeknownst to them,
23   were due to a medical condition; (2) his coworkers gave him various nicknames, some of
24   which he perceived as being race-related or culturally insensitive; (3) he had been told that
25   Hoffman "pre-empted [his] transfer to the new fab by telling the guys in the shop to watch
26   [him without him knowing] because 'he take[s] long breaks and to watch his work'"; (4)
27   he was concerned that Hoffman had planted a bias about "the Jamaican stereotype people
28   often reference"; and (5) his work environment was such that he felt "people can say

anything to each other without any repercussions or concern about the person's feelings or cultural sensitivity." (*Id.*)

The next day, May 15, 2014, DeFrancis met with Anderson to discuss the matters raised in this email. (*Id.* at 87.) Anderson asserts that, during this meeting, he learned that Hoffman had made statements to DeFrancis that initially caused DeFrancis to view him negatively. (Doc. 44-1 at 19, lines 1-12.) Anderson further asserts that DeFrancis attempted to address his complaints and, "within a few days, he verbally invited [Anderson] to an off-campus lunch meeting, wherein he attempted to explain aspects of discrimination and racism, showed [Anderson] a photo of his own inter-racial family, gave a personal account and told [Anderson] that Hoffman had him viewing [Anderson] through a narrow lens." (Doc. 52-1 ¶ 27.)

In an email memorializing the May 15, 2014 meeting, DeFrancis told Anderson that he "appreciate[d] [Anderson] having the courage to come forward and let [him] know that the atmosphere . . . has been in a word, toxic." (Doc. 44-1 at 87.) Concerning Anderson's "feeling that [his] manager is out to get [him] fired," DeFrancis responded that it "should be alleviated since [his] prior manager has retired and [DeFrancis had] told [him] as recently as last week how much [DeFrancis] appreciate[d] having [him] in the module." (*Id.*) Concerning the "name calling," DeFrancis noted that Anderson "stated that this action was really just a single person and ended in the January time frame when [he] told this employee [he] didn't appreciate [the] remarks and [the coworker] apologized and corrected his behavior." (*Id.*) Concerning the general "sense of humor in the . . . shop," DeFrancis stated that he and Anderson "discussed the need for [Anderson] to change [his] behavior and not allow[] anyone on the team to make [him] feel like [he didn't] belong. If [he felt] a joke or comment [was] hurtful [he] need[ed] to communicate that to [the] co-worker so they ha[d] the opportunity to change their behavior" and if the joking were to continue or if someone was "making [him] feel inadequate," Anderson needed to "alert [his] manager ASAP." (*Id.*)

In summary, DeFrancis said that there was "NEVER a reason for anyone at Intel to

make another employee feel like they don't belong . . . and their work is not appreciated" and that Anderson had DeFrancis's support.  (*Id.*)  DeFrancis noted that he would be "requiring all the ISC employees . . . to retake the 2014 code of conduct training" and that he had "explored the opportunity for [Anderson] to leave the shop and go to the fab, if this is something [Anderson felt he] want[ed] to do."  (*Id.*)  He also informed Anderson that he would be "spending much more time in the shop and monitoring the level of conversation that takes place."  (*Id.*)

Following the May 2014 meeting between Anderson and DeFrancis, Anderson's co-workers did not continue their previous behavior.  (Doc. 52-1 ¶¶ 27-28.)

### B.  **Tuition Reimbursement**

Intel has a tuition reimbursement program that "provides financial assistance . . . to eligible participants completing a job-related degree program/coursework."  (Doc. 44-3 ¶ 3; *id.* at 7-12.)  A degree program or coursework qualifies for reimbursement if it (1) is "work-related," in that the employee "must be able to presently, or in the future, apply the skills learned to [his or her] job at Intel"; (2) is "required to complete the general education requirements for a work-related degree"; or (3) "[t]eaches necessary, basic skills such as English as a second language."  (*Id.* at 9.)

In a declaration, Tammi Westall ("Westall"), who was a Fab 32 department manager from January 2011 to April 2016, states that "[t]uition assistance is not guaranteed."  (Doc. 44-3 ¶¶ 1, 4.)  Westall further states that, under Intel's policy, it is "highly[] recommended" that an employee submit an Education Approval Form ("EAF") to a manager before submitting a formal request for tuition reimbursement.  (*Id.* ¶¶ 4-5; *id.* at 8.)  "Managers are responsible for assuring that all criteria established in [Intel's] guidelines are followed."  (*Id.* at 11.)  Approval is "at the manager's discretion," and managers "must evaluate if there is budget available in their cost centers before approving the educational tuition reimbursement."  (*Id.* at 12.)  Westall asserts that "[m]anager approval is key because the business unit is responsible for approved costs" and that "[f]inancial assistance for a Fab 32 employee would have come out of the Fab 32 operating budget."  (*Id.* ¶¶ 6-7.)

1    When Anderson first arrived at Fab 32, he expressed interest to his then-supervisor
2    Hoffman about seeking tuition reimbursement for an Architectural CAD (computer-aided
3    design) program in which he was already enrolled.  (Doc. 52-1 ¶ 10.)  In response, Hoffman
4    told Anderson that the program was not relevant to his work at Intel but she "would allow
5    [him] to use personal time to attend classes, a sentiment DeFrancis would continue to
6    honor, as well."  (*Id.*)

7    Anderson ultimately declined to submit a request for tuition assistance for the
8    Architectural CAD program.  (Doc. 44-3 ¶ 10.)  Additionally, in  May 2014, Anderson
9    acknowledged in an email to DeFrancis that the "real reason" he was attending the class
10   "was to learn how to build [a] house so one day [he] wouldn't have to go through
11   foreclosure again."  (Doc. 44-1 at 91.)

12   At some point in 2014, Anderson began doing more work for an Intel engineer, Troy
13   Wanstreet, which included creating drawings of mechanical parts.  (Doc. 44-1 at 22, line
14   24, to 26, line 18.)  Anderson was planning to take two classes on 3D CAD applications
15   and believed these classes would benefit Intel in the work that he was doing.  (*Id.* at 23,
16   line 15, to 24, line 13.)  According to Anderson, DeFrancis was "[m]ore than supportive"
17   of Anderson's pursuit of tuition reimbursement for these classes.  (*Id.* at 27, lines 17-19.)[1]
18   DeFrancis and Anderson arranged to meet in September 2015 to discuss the matter in more
19   detail, but DeFrancis canceled the meeting at the last moment because his wife was in
20   surgery.  (*Id.* at 28, line 15, to 30, line 2; Doc. 52-5 at 2.)  Neither party rescheduled the
21   meeting, and Anderson ultimately did not submit a request for reimbursement.  (Doc. 44-
22   1 at 28, line 15, to 29, line 1.)

23   Westall, the manager would have been responsible for approving any request for
24   tuition reimbursement by Anderson, states that she "highly doubts" she would have

---

[1]    Anderson states that "Intel recognized as early as January 17, 2016, that [his] educational pursuits . . . were being used to directly benefit the company."  (Doc. 52-1 ¶ 19.)  In support, Anderson attaches what appears to be an excerpt of a performance review stating that he "ha[d] used his schooling to help develop a new ergonomic blank-off for blasting the electrodes."  (Doc. 52-5 at 23.)  However, this excerpt is undated and does not identify the author.

approved any such request because her department's "budget was limited," Anderson's "coursework d[id] not appear to be job-related," and the "only degrees [in Anderson's organization] being approved were degrees in engineering."  (Doc. 44-3 ¶¶ 8, 10, 12.)

## C.   **Attendance**

Intel requires employees to "notify their manager prior to any absence, including arriving late or leaving early."  (Doc. 44-2 ¶ 6.)  Intel's relevant guidelines also "require that vacation be placed on the vacation calendar," and according to Dawn Black, a member of Intel's human resources department, "[b]usiness groups within the fabs [including Anderson's Fab 32 group] typically require advance notice of vacation 3-7 days in advance, which must be approved by an[] employee's manager prior to taking the time off as vacation."  (Doc. 44-2 ¶¶ 8-9.)[2]

### 1.   The Written Warning

In July 2015, Anderson sent a monthly update email to DeFrancis that disclosed his school schedule for the fall 2015 semester.  (Doc. 52-5 at 50.)  DeFrancis apparently did not respond to this email and did not provide his approval for the projected absences.  (Doc. 44-1 at 83, line 6, to 84, line 1; Doc. 44-2 at 8; Doc. 52-5 at 46.)  Anderson subsequently went on leave from July 2015 until September 2015.  (Doc. 52-5 at 50.)

When Anderson returned in September 2015, he twice left work to go to school without putting his time off on the vacation calendar and without obtaining approval from DeFrancis.  (Doc. 44-2 at 8; Doc. 52-5 at 46; Doc. 44-1 at 35, lines 12-22.)  It is undisputed that he was supposed to put his vacation time on the calendar.  (Doc. 44-1 at 35, lines 12-14.)  Anderson asserts that, following these two incidents, DeFrancis yelled at and admonished him in the hallway.  (Doc. 44-1 at 30, line 15, to 31, line 2; *id.* at 34, lines 15-19; Doc. 52-1 ¶¶ 35-38.)  Anderson further asserts that he had never seen another Intel employee subjected to such treatment.  (Doc. 44-1 at 30, lines 6-14.)

Following this incident, Anderson reminded DeFrancis that he had, in fact, sent his

---

[2]     Intel attached a copy of the AZFSM technician vacation policy.  (Doc. 44-2 at 13-15.)  Although this policy states that it was updated in September 2019, Anderson does not dispute its applicability during his period of employment.

school schedule to DeFrancis.  (Doc. 52-5 at 46; Doc. 44-1 at 83, lines 22-24.)  In response, DeFrancis "apologize[d] for not recalling [Anderson's] school schedule" but noted that if Anderson "had put these dates/times on the calendar [they] would have never had a misunderstanding."  (Doc. 52-5 at 46.)  DeFrancis stated that, going forward, he needed Anderson not to "expect [DeFrancis] to remember a blurb from an email [Anderson] sent 2 months prior giving him [Anderson's] projected school schedule" and "to put these events on the vacation calendar so . . . all understand" when Anderson would be out.  (Id.)

On October 7, 2015, Anderson reported DeFrancis to HR for their encounter in the hallway.  (Doc. 44-1 at 39, lines 9-25; Doc. 44-2 ¶ 10.)  At some point after making this report, Anderson also raised unspecified concerns about his personal safety.  (Doc. 44-2 ¶ 11.)  Intel placed Anderson on leave/suspension with pay while it investigated his allegations.  (Id.)[3]  Following this investigation, Intel determined that "there was no threat or concern in the workplace to warrant [Anderson's] absence from the workplace" and directed Anderson to return to work.  (Id. ¶ 12; Doc. 44-1 at 72, lines 5-13.)  In response, Anderson requested and was granted a leave of absence.  (Doc. 44-2 ¶ 13; Doc. 52-1 ¶¶ 44-45.)  Specifically, Anderson was "on a continuous medical leave of absence from November 4, 2015 through May 30, 2016, after which he received intermittent leave."  (Id.)

On August 18, 2016, Intel issued Anderson a written warning related to his absences in 2015.  (Doc. 44-2 ¶ 5; id. at 8.)[4]  It stated:

> On two separate occasions between 9/17/2015 and 9/24/2015 [Anderson] has not followed the proper protocols in regards [to] time off for school. [Anderson] used vacation time on his timecard without the time being

---

[3]    Intel asserts that Anderson received pay during the period of leave and states that it characterized the leave as a "suspension" only because it did not have an internal administrative code for paid administrative leave.  (Doc. 44-1 at 67, lines 3-9; Doc. 52-3 at 16.)  Anderson disputes this.  (Doc. 52-1 ¶ 40 ["Intel claims that I was on 'Administrative Leave with Pay;' however, on or about November 2, 201[5], I was suspended by Tammi Westall . . . ."]; Doc. 44-1 at 67, lines 16-18 [acknowledging receipt of pay during period of suspension].)

[4]    Bobby Pitts, an Intel area manager, stated in his declaration that "[i]t is not unusual that the Written Warning was issued months after the attendance issues" and that they "would not have issued a written warning to [Anderson] while he was on leave."  (Doc. 44-4 ¶ 10; see also Doc. 44-2 ¶ 20 ["While related to [Anderson's] attendance in September 2015, the Written Warning had been on hold while [Anderson] was on leave."].)

approved by his manager or using the normal submission process of using the vacation calendar. [Anderson] also failed to notify his manager when he was leaving site for extended periods of time to attend school, thus potentially creating a safety issue. Prior to these incidents [Anderson] had followed the approved protocol for over 2yrs and fully understood the need to place "school" time o[n] the vacation calendar for approval by his manager.

(*Id.*) The only consequences of the written warning were that (1) Anderson could not obtain a transfer for 30 days and (2) "if [Anderson were to] violate Intel's Attendance Guideline during any rolling 12-month period, further disciplinary action [would] be taken up to and including termination." (*Id.* at 8.)

### 2.   The Comparative Incident

In September 2016, Anderson put in a vacation request. (Doc. 52-4 at 20; Doc. 44-2 ¶ 21.) DeFrancis responded that he couldn't approve the request because Anderson's coworker, Paul Matteau, was already scheduled "to be off on the same day." (Doc. 52-4 at 20.) DeFrancis explained that the coworker's "wife [had] been texting [him] about a month so she could book a surprise flight for him to go to Connecticut to see his dad." (*Id.*; *id.* at 17-18 [copies of the text messages]; Doc. 44-2 ¶ 22.) DeFrancis "did not put [the request] on the area calendar, assumedly to maintain the surprise." (Doc. 44-2 ¶ 22; Doc. 52-1 ¶ 64.)

Unhappy about the denial of his vacation request, Anderson reached out to a member of Intel's human resources department to raise "very serious recent concerns of inconsistency" and "continued discriminating treatment." (Doc. 44-2 at 27-28.) In particular, Anderson wondered why "texted messages [were] more valid than an actual Blue Badge employee's email communication" and stated that he "believe[d] that [he had] been discriminated against by . . . DeFrancis." (*Id.* at 27.) As a remedy, Anderson requested dismissal of the earlier written warning and "implor[ed] Intel to use its resources to check its own policies to verify whether or not this type of vacation request is allowed; and, clarify that [Anderson] was not being discriminated against as a person whose demography only represents 3.5% of Intel's overall population." (*Id.* at 28.)

1    Intel did not withdraw the written warning.  (Doc. 44-2 ¶ 23; Doc. 52-1 ¶ 66.)

2        D.    **Laptop**

3        In approximately February 2014, Intel took away company-issued laptops from

4    many technicians, including Anderson.  (Doc. 52-2 at 2; Doc. 44-1 at 46, lines 18-25.)  Intel

5    explained that this was a "cost cutting measure."  (Doc. 44-3 ¶ 16; Doc. 44-1 at 46, lines

6    18-22.)  According to Westall, under the new laptop policy, "justifications for laptops had

7    to be approved by group leaders" and "[a]lthough group leaders like Paul DeFrancis could

8    assign laptops to technicians on a project basis, they were limited in how many laptops

9    they could assign."  (Doc. 44-3 ¶ 17.)  The written laptop policy provides that the "decision

10   for laptop usage will be an Area Decision."  (Doc. 44-3 at 14.)[5]  "Justifications [for a laptop]

11   are approved by GL [Group Leaders] and "[e]ach module team GL can approve up to (4)

12   laptops each."  (*Id.*)  If "laptop needs are greater than (4) laptops," "[a]pproval must be

13   given by AM [Area Manager]."  (*Id.*)  Any decision to grant a laptop could be "temporary

14   (assigned for specific task completion) or permanent (job role requires use)."  (*Id.*)

15   "Technicians had access to FLEX Desk PC's in the common area" and there were "also

16   one or more PCs in the ITC room where [Anderson] worked."  (*Id.* ¶ 18; *id.* at 14.)

17       In Anderson's group, 5 of 24 employees were initially able to keep their laptops.

18   (Doc. 44-2 at 36; Doc. 52-1 ¶ 22.)  By August 2016, 9 of 16 employees in the module had

19   laptops.  (Doc. 44-2 at 36.)  This group included four "POC's[,] one on each shift"; two

20   "[e]ng[ineering] backfill folks"; two preventative maintenance masters; and one individual

21   who "came to the group with a laptop."  (*Id.*; Doc. 44-1 at 47, lines 1-21.)

22       Anderson believes he should have been issued a company-owned laptop with

23   AutoCAD software because he was working on drawings for Intel.  (Doc. 52-1 ¶¶ 15, 24;

24   Doc. 44-1 at 47, line 22, to 48, line 10; *id.* at 46, lines 5-17.)  Anderson also contends he

25   should have been issued a company-owned laptop because he was selected as a "Quality

26

27   ───────────────
     [5]    The laptop policy attached to Intel's motion indicates that it was last updated in
28   September 2019 (Doc. 44-3 at 14), but the Court will consider it because Anderson does
     not dispute it was in place during the relevant time period.  (Doc. 52-1 ¶ 23 [citing Intel's
     exhibit].)

Check ('QC') technician, giving [him] additional responsibilities for which . . . all other QC technicians had been allowed to keep their laptops for the same or similar responsibilities." (Doc. 52-1 ¶ 16; Doc. 52-2 at 4.)  Anderson asked DeFrancis for a laptop but his request was denied.  (Doc. 44-1 at 48, lines 11-13.)   In an email, DeFrancis explained that Anderson did not require a laptop and that he would "rather have [another employee] turn his [laptop] back in than set the precedent of giving laptop[s] out without a business need."  (Doc. 52-4 at 24.)  Anderson ultimately used his personal laptop and AutoCAD software, which he used for school, for his work-related drawings.  (Doc. 52-1 ¶ 24; Doc. 44-1 at 77, lines 6-24.)

### E.   Invention Disclosure Forms

On August 5, 2016, Anderson submitted an Invention Disclosure Form ("IDF") to DeFrancis for two inventions: (1) an electrograde fixture, and (2) a waveguide fixture. (Doc. 44-2 ¶ 25; *id.* at 30-31.)  DeFrancis initially denied the IDF.  (Doc. 44-2 ¶ 24; Doc. 44-1 at 50, lines 5-11.)   Anderson reported the denial to a member of Intel's human resources department.  (Doc. 44-2 ¶ 24; Doc. 44-1 at 50, lines 12-14.)

On August 27, 2016, Anderson resubmitted the IDF to DeFrancis.  (Doc. 44-2 ¶ 26; *id.* at 33-34.)  DeFrancis approved the IDF shortly thereafter.  (*Id.* ¶ 27; Doc. 52-5 at 27-28.)

### F.   Involuntary Separation Program

In April 2016, Intel "announced a restructuring . . . which would include a combination of voluntary and involuntary departures." (Doc. 44-2 ¶ 16.)  The Involuntary Separation Program ("ISP") "included employees who met the following performance criteria: (1) Improvement Required yearly performance rating in 2016, or (2) Consecutive stock share level (SL) 4 or SL5 in 2015 and 2016 with no Outstanding or Exceeds rating in those years, or (3) SL4 or SL5 in 2016 focal with no Outstanding and Exceeds rating in 2015 or 2016 and hired before January 1, 2015."  (*Id.*)

In or around May 2016, while on FMLA leave, Anderson learned that "company-wide layoffs were in the works."  (Doc. 52-1 ¶¶ 42, 47.)  Anderson, "unable to access [his]

company email," emailed a member of Intel's human resources department to inquire whether he was selected for the Voluntary Separation Program ("VSP").  (Doc. 52-5 at 4.) In response, Anderson was told that, "[b]ased on the selection criteria, [he had] been identified for ISP . . . selection."  (*Id.*)  Anderson asked to receive information about the ISP package but was told that "[p]er [Intel's] process, employee information is provided upon return from leave."  (*Id.* at 7.)

Intel has submitted evidence that Anderson met the criteria for inclusion in the ISP "because he received an SL5 in 2016, did not receive an Outstanding or Exceeds rating in 2015, and was hired before January 1, 2015."  (Doc. 44-2 ¶ 17.)  Anderson does not dispute that he met the ISP criteria but contends the only reason he met the criteria is because he had previously been subjected to "adverse employment actions . . . taken by Westall and DeFrancis," particularly the written warning and DeFrancis's rating of him as "Successful."  (Doc. 52-1 ¶ 42.)

In any event, Intel later changed course and decided *not* to include Anderson in the ISP.  (Doc. 44-2 ¶ 18.)  As a result, Anderson returned to work at Intel in July 2016.  (*Id.*)

G.    **Recertification**

As noted, from around November 2015 to July 2016, Anderson was out on leave. (Doc. 44-4 ¶ 4.)  Bobby Pitts, an area manager (and DeFrancis's supervisor), states in a declaration that, upon Anderson's return in July 2016, Anderson was required to be "recertified to work on certain tools because his certificates had expired."  (*Id.* ¶¶ 1, 3, 5; Doc. 44-1 at 57, lines 14-21.)  Pitts explains that "[r]e-integration of an employee to work requires review of their certifications, and supervisors are expected to develop a plan to have the employee retrained and recertified."  (Doc. 44-4 ¶ 6; *id.* at 6 ["AZFSM Employee Re-Integration List"].)  As part of recertification, Anderson "would have been assigned a trainer and someone who could recertify him to work on the tools independently."  (*Id.* ¶ 7.)  "In the meantime, [Anderson] could still perform maintenance on the tools without certifications, so long as the trainer or certifier reviewed his work.  That person would have been accountable for the work."  (*Id.*; Doc. 44-1 at 57, lines 22-25.)

1    Anderson asserts that, upon his return in July 2016, his training was "escalated to a

2    level [he had] never seen before at Intel" and was "completely different from [his] cohorts."

3    (Doc. 44-1 at 53, lines 2-19; *id.* at 56, lines 4-7.)  For example, Anderson states that "none

4    of [his] cohorts were required to be within a three feet or four feet eyesight of their trainer

5    or peer trainer." (*Id.* at 53, lines 20-23.)  Anderson also asserts that he was given a shorter

6    time frame to get certified than co-workers and that no definitive certification deadline was

7    ever set by his manager.  (*Id.* at 56, lines 22-25; *id.* at 57, lines 1-10.)

8        H.    **EEOC Proceedings**

9            1.    The First EEOC Complaint

10   In February 2016, while on FMLA leave, Anderson filed an EEOC complaint

11   alleging he had been "subject to harassment in the workplace due to [his] national origin,

12   Jamaican and due to [his] disability." (Doc. 44-2 at 22.)  This complaint further asserted

13   that "[o]n or around October 31, 2015, [Anderson] was wrongfully suspended without a

14   justifiable reason." (*Id.*)  This complaint also alleged that Anderson was "subjected to

15   different terms and conditions" than white employees because "whites [were] being

16   reimbursed for school tuition and [were] given laptops while having less workload." (*Id.*)

17   The complaint concluded that Anderson "believe[d] that [he had] been discriminated

18   against due to [his] race-Black and national origin, Jamaican, and retaliated against in

19   violation of Title VII" and "discriminated against due to [his] disability and retaliated

20   [against] in violation of the Americans with Disabilities Act." (*Id.*)

21           2.    The Second EEOC Complaint

22   In August 2016, Anderson filed another EEOC complaint.  (*Id.* at 24.)  This

23   complaint alleged that, since the filing of his previous complaint, Anderson had been

24   "subjected to harassment, intimidation, and suspension from employment." (*Id.*)  Among

25   other things, the second complaint addressed Anderson's designation for inclusion in the

26   ISP, "which is a less favorable program than VSP." (*Id.*)[6]

27   _____

28   [6]    Intel asserts that it did not have notice of Anderson's second EEOC complaint when
      it issued the written warning related to Anderson's attendance.  (Doc. 44-2 ¶¶ 19-20.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3.   Conclusion Of EEOC Proceedings

In November 2019, the EEOC dismissed Anderson's charge of discrimination against Intel.  (Doc. 52-1 ¶ 72.)  According to Anderson, the agency was "unable to find any 'clear' violation of the law."  (*Id.*)

## I.   **End Of Employment**

Intel has a Job Reassignment Program as part of its "attempt to comply with reassignment obligations under the Americans with Disabilities Act."  (Doc. 52-5 at 17.) The purpose of the program is to "allow employees who are no longer able to perform their jobs because of a disability . . . to search for a new position within Intel."  (*Id.*)  Under the program, when an employee's "leave ends and [he or she is] returned to work, [the employee is] given the opportunity to choose between . . . the Immediate Separation Option (Option One) or the Reassignment Pool Option (Option Two)."  (*Id.*)  If the employee chooses the Immediate Separation Option, the employee receives two months of salary, "Enhanced Separation Pay based on [the employee's] length of service," six months of career transition services, and four months of health insurance.  (*Id.*)  If the employee chooses the Reassignment Pool Option, the employee receives two months of "paid time to search for a position at Intel that matches [the employee's] skill sets and restrictions," and if the "job search is not successful[,] termination from Intel will occur."  (*Id.*)  "At the time of termination, [the employee] may receive additional benefits in exchange for signing a release of all claims against Intel," including six months of "virtual Career Transition Services" and "Standard Separation Pay based on [the employee's] length of service."  (*Id.* at 18.)

On September 24, 2016, Anderson "received a continuous medical leave of absence from September 24, 2016 to October 11, 2016, after which he received approval for intermittent leave."  (Doc. 44-2 ¶ 28.)  On September 26, 2016, Intel issued an offer for Anderson to participate in the Job Reassignment Program.  (Doc. 52-5 at 17-18.)

Nevertheless, Anderson resigned on October 17, 2016.  (Doc. 44-2 ¶ 29; *id.* at 39-40.)  In Anderson's resignation letter, he stated that he was leaving Intel "[d]ue to [his]

1   disability and present state of disease." (*Id.* at 39; Doc. 44-1 at 65, lines 14-16.)  He stated

2   that he did "not see how [he could] accept either options from the Job Reassignment

3   Program" because he did not want to "sign away [his] claims against Intel without being

4   party or privy to the resolution" or without "being allowed to carefully review the

5   separation agreement." (Doc. 44-2 at 39.)

6   II.   Procedural History

7        On February 5, 2019, Anderson initiated this action. (Doc. 1.)

8        On August 21, 2019, Intel answered the complaint. (Doc. 8.)

9        On May 6, 2020, Intel filed its motion for summary judgment. (Doc. 44.) The

10  motion thereafter became fully briefed. (Docs. 52, 53.)[7]

11                              **DISCUSSION**

12  I.   Summary Judgment Standard

13       A party moving for summary judgment "bears the initial responsibility of informing

14  the district court of the basis for its motion, and identifying those portions of 'the pleadings,

15  depositions, answers to interrogatories, and admissions on file, together with the affidavits,

16  if any,' which it believes demonstrate the absence of a genuine issue of material

17  fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

18  "In order to carry its burden of production, the moving party must either produce evidence

19  negating an essential element of the nonmoving party's claim or defense or show that the

20  nonmoving party does not have enough evidence of an essential element to carry its

21  ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210

22  F.3d 1099, 1102 (9th Cir. 2000). "If . . . [the] moving party carries its burden of production,

23  the nonmoving party must produce evidence to support its claim or defense." *Id.* at 1103.

24       "Summary judgment is appropriate when 'there is no genuine dispute as to any

---

[7]      Anderson's response contains a separate statement of facts. (Doc. 52-1.) Although otherwise permitted by the Local Rules, *see* LRCiv 56.1(a), the Court suspended this requirement and ordered that "the parties may not file separate statement of facts . . . and instead must include all facts in the . . . response itself." (Doc. 23 at 5.) The Court will nevertheless consider the separate statement of facts because the Court construes it as a declaration: Anderson's statements are expressly declared as "true and correct" "under penalty of perjury" and the document is signed and dated. (Doc. 52-1 at 17.)

material fact and the movant is entitled to judgment as a matter of law.'" *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018) (quoting Fed. R. Civ. P. 56(a)).  "A genuine dispute of material fact exists if 'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *United States v. JP Morgan Chase Bank Account No. Ending 8215 in Name of Ladislao V. Samaniego, VL: $446,377.36*, 835 F.3d 1159, 1162 (9th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986)).  The court "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference in the nonmoving party's favor." *Rookaird*, 908 F.3d at 459.  Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

II.     Title VII

    A.     **Discrimination Claim**

"Title VII of the Civil Rights Act of 1964 makes it 'an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 63 (1986) (quoting 42 U.S.C. § 2000e-2(a)(1)).  The Ninth Circuit analyzes Title VII claims via the *McDonnell Douglas* burden-shifting framework.  *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010).  Under this framework:

> [P]laintiffs must first establish a prima facie case of employment discrimination.  If plaintiffs establish a prima facie case, [t]he burden of production, but not persuasion, then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action.  If defendant meets this burden, plaintiffs must then raise a triable issue of material fact as to whether the defendant's proffered reasons . . . are mere pretext for unlawful discrimination.

*Id.* (alteration in original) (citations and internal quotation marks omitted).

To establish a prima facie case of employment discrimination based on

1   circumstantial evidence, plaintiffs must show: "(1) that they are members of a protected
2   class; (2) that they were qualified for their positions and performing their jobs
3   satisfactorily; (3) that they experienced adverse employment actions; and (4) that similarly
4   situated individuals outside [their] protected class were treated more favorably, or other
5   circumstances surrounding the adverse employment action give rise to an inference of
6   discrimination." *Id.* (alteration in original) (internal quotation marks omitted).  "In the
7   context of employment discrimination law under Title VII, summary judgment is not
8   appropriate if, based on the evidence in the record, a reasonable jury could conclude by a
9   preponderance of the evidence that the defendant undertook the challenged employment
10  action because of the plaintiff's race." *Cornwell v. Electra Cent. Credit Union*, 439 F.3d
11  1018, 1028 (9th Cir. 2006).

12      Intel does not appear to dispute that Anderson has met the first and second elements
13  of his prima facie case but argues that Anderson "cannot show that he suffered any adverse
14  employment action or that he did so under circumstances giving rise to an inference of
15  discriminatory intent."  (Doc. 44 at 8.)   The Court will address each alleged adverse
16  employment action in turn.

17              1.   Written Warning
18                  a.   **Parties' Arguments**

19      Intel argues that the attendance-related written warning it issued to Anderson in
20  August 2016 is simply not an adverse employment action.  (Doc. 44 at 8-10.)   Intel
21  emphasizes that, although the written warning may have "restrict[ed] [Anderson's] ability
22  to transfer for 30 days," Anderson "has no evidence that this temporary restriction carried
23  any real change in the terms or conditions of his employment."  (*Id.* at 9-10.)

24      In response, Anderson concedes that "[t]here exists widespread precedent that
25  [written warnings], absent consequential discipline, do not constitute adverse employment
26  actions."  (Doc. 52 at 13.)  Nevertheless, Anderson cites *Prager v. Joyce Honda, Inc.*, 146
27  A.3d 177 (N.J. Super. Ct. App. Div. 2016), for the proposition that courts use an "objective
28  standard to evaluate whether written warnings were an adverse employment action:

- 16 -

1    whether a reasonable person could have found them to be materially adverse."  (*Id.* at 13-

2    14.)  Anderson also argues that a different written warning issued by Westall in November

3    2015 "led to [his] qualification and wrongful designation" for ISP.  (*Id.* at 14.)

4          In reply, Intel argues that *Prager* is distinguishable, that Anderson "does not

5    address, and thus concedes, [Intel's] argument that the written warning issued to him in

6    August 2016 for attendance issues was not an adverse employment action under Title VII,"

7    that Anderson has not submitted any evidence that he received a different written warning

8    from Westall, and that any such warning could not, in any event, have led to his inclusion

9    in the ISP because "ISP was not based on disciplinary warnings, but a set formula based

10   on an employee's annual performance ratings."  (Doc. 53 at 3 & n.2.)

11                        b.    **Analysis**

12         "An adverse employment action is one that materially affect[s] the compensation,

13   terms, conditions, or privileges of . . . employment."  *Davis v. Team Elec. Co.*, 520 F.3d

14   1080, 1089 (9th Cir. 2008) (alterations in original) (internal quotation marks omitted).

15   "Several courts within the Ninth Circuit have held that a warning letter is not an adverse

16   employment action," at least where the warning letter does not result in material changes

17   to the conditions or terms of employment.  *Moore v. Marriott Int'l, Inc.*, 2014 WL 5581046,

18   *10 (D. Ariz. 2014).  *See also Tumblin v. USA Waste of Cal., Inc.*, 2016 WL 3922044, *8

19   (C.D. Cal. 2016); *Sanchez v. California*, 90 F. Supp. 3d 1036, 1056 (E.D. Cal. 2015)

20   ("Written warnings . . . are not adverse actions where they do not materially affect the terms

21   and conditions of employment."); *Cozzi v. County of Marin*, 787 F. Supp. 2d 1047, 1061

22   (N.D. Cal. 2011) (same); *Govan v. Sec. Nat'l Fin. Corp.*, 2011 WL 1843294, *3 (D. Ariz.

23   2011) ("While Plaintiff believes the warning to be unfounded, he presents no evidence that

24   it was disseminated to others or resulted in a demotion, a change in job duties, or any other

25   material change in the terms, conditions, or privileges of his employment.  In short, the

26   warning cannot reasonably be construed as an adverse employment action.") (citation

27   omitted); *Hoang v. Wells Fargo Bank, N.A.*, 724 F. Supp. 2d 1094, 1104 (D. Or. 2010)

28   ("[S]ince the letter did not implement any materially adverse change in the terms and

conditions of Hoang's employment, it was not itself an adverse employment action.").

The attendance-related written warning that Anderson received in August 2016 was not an adverse employment action. Anderson does not appear to dispute this conclusion and has not, at any rate, presented any evidence that the written warning affected the terms, conditions, or privileges of his employment.[8] The case on which he relies, *Prager*, addressed a state-law claim for discrimination, not a claim under Title VII.

Finally, even assuming that Anderson also received a separate warning from Westall in 2015, Anderson has not presented any evidence that it materially changed the terms or conditions of his employment. Nor has Anderson offered any evidence to rebut Intel's declaration that disciplinary warnings did not factor into the formula for ISP designation (Doc. 44-2 ¶¶ 16-17). In other words, Anderson has not presented any evidence that this alleged written warning was in fact an employment *action* or, even if it was, that it carried any consequences beyond factoring into a negative review that was not disseminated to him. *Cf. Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1113 (9th Cir. 2000) (negative performance evaluation was not adverse employment action because employee "was not demoted, was not stripped of work responsibilities, was not handed different or more burdensome work responsibilities, was not fired or suspended, was not denied any raises, and was not reduced in salary or in any other benefit"). *See also Lyons v. England*, 307

_____

[8] One wrinkle is that the August 2016 written warning prevented Anderson from transferring for 30 days. The Court need not decide whether a prohibition on transferring could ever transform an otherwise unactionable warning into an adverse employment action because Anderson did not raise the issue and has not established that the prohibition would have been material to the conditions of *his* employment—he has not argued, for example, that he sought and was denied a transfer during the 30-day period in question. *Cf. Campbell v. Haw. Dep't of Educ.*, 892 F.3d 1005, 1013 (9th Cir. 2018) ("Campbell does not identify a single aspect of her work that changed as a result of the investigation. The mere fact that the school received and investigated allegations of misconduct against Campbell—with no resulting change to the conditions of her employment—is not an adverse employment action for purposes of her disparate treatment claim."). Nor has Anderson identified a similarly-situated comparator. *Cf. Seldon v. Total Sys. Servs., Inc.*, 653 F. Supp. 2d 1349, 1375 n.30 (M.D. Ga. 2009) ("Even to the extent Plaintiff might establish that Defendants' failure to allow her to post out of her department is an adverse employment action, Plaintiff has failed to identify a similarly-situated comparator."); *Welcome v. Wix Corp.*, 2006 WL 406603, *7 (W.D.N.C. 2006) ("[E]ven if the Plaintiff could establish that the Defendant's decision to deny his request to transfer amounted to an adverse employment action, he has been unable to show that other, non-African-American workers were permitted transfers under apparently similar conditions.").

F.3d 1092, 1118 (9th Cir. 2002) (in retaliation context, evaluation was not an adverse employment action because employee did "not allege that his mediocre evaluations were accompanied by any meaningful change in work assignments, either in the form of relieving him of responsibilities or saddling him with additional, burdensome tasks").

2.  <u>Laptop</u>

a.  **Parties' Arguments**

Intel argues that its failure to provide a laptop to Anderson does not qualify as an adverse employment action because there is no evidence that "the refusal significantly interfered with his ability to perform his job or made his job unreasonably dangerous." (Doc. 44 at 10-11.)  Intel further argues that Anderson's job could be performed without a laptop and that completing drawings for engineers "was not his primary job." (*Id.* at 11.) Finally, Intel notes that Anderson did not "bear any increased costs where he already had a personal laptop with AutoCAD software." (*Id.*)

In response, Anderson concedes that the "mere failure to provide an employee with necessary work equipment . . . may not, in itself, be considered an adverse employment action, as [Intel] suggests." (Doc. 52 at 14.)  Nevertheless, Anderson invokes California Labor Code § 2802(a), which provides that an "employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer." (*Id.*)  Anderson argues that, "[t]o date, Intel has not reimbursed" him. (*Id.*)

In reply, Intel reiterates that Anderson already had his own personal laptop with AutoCAD software and argues that Anderson's reliance on a California statute is misplaced. (Doc. 53 at 4 & n.3.)

b.  **Analysis**

Intel's failure to provide a company-owned laptop to Anderson was not an adverse employment action.  There is no evidence that Anderson's lack of access to a company-owned laptop caused a material change to the terms or conditions of his employment.

Indeed, Anderson does not dispute that Intel offered desktop work computers and acknowledges that he was able to use his personal laptop and AutoCAD software—which he already owned—to complete drawings.  The lack of a company-owned laptop thus resulted in an inconvenience at most, which is insufficient to give rise to an adverse employment action.  *See, e.g., Davis*, 520 F.3d at 1090-91 (employee did not establish prima facie case based on allegations "that she was given an inferior quality vest and gloves, and other equipment" because "the supplies were only slightly inferior, or were replaced" and the employee "provided no evidence that the vest and gloves affected her work conditions, or that other workers were given better equipment"); *Gross v. Nat'l Broad. Co.*, 232 F. Supp. 2d 58, 72 (S.D.N.Y. 2002) ("Being refused access to the equipment of her choice on demand may have inconvenienced Gross, but it does not rise to the level of an adverse employment action."); *Casey v. Mabus*, 878 F. Supp. 2d 175, 185 (D.D.C. 2012) (same); *Arrieta v. Yellow Transp., Inc.*, 2008 WL 5220569, *6 (N.D. Tex. 2008) (same).

Anderson's invocation of a California Labor Code provision does not compel a different result.  Among other things, Anderson has not provided any evidence that the California Labor Code provision applied to him, as it is undisputed that he worked for Intel in Arizona during the relevant time period.

> 3.   Tuition Reimbursement

> a.   **Parties' Arguments**

Intel argues that Anderson's arguments related to tuition reimbursement are unavailing because Anderson "never ended up applying [for] tuition reimbursement." (Doc. 44 at 11-12.)  Intel further argues that, even if Anderson had applied, "[a]n employer's denial of a training request, without something more, is not itself an adverse employment action." (*Id.* at 12, alteration in original and internal quotation marks omitted).

Anderson concedes that the "simple act of ignoring requests for Tuition Reimbursement may, on its own, not be considered an adverse employment action." (Doc. 52 at 15.)  He argues, however, that it "would be difficult . . . for Intel to deny that two

inventions created by [him], patents pending, were a direct result of [his] chosen course of study" and that the "act of withholding of company benefits of reimbursing the educational costs incurred by the employee, is itself, an adverse employment action." (*Id.*)  Anderson notes that the "works [he] rendered . . . were above and beyond [his] existing pay grade and the scope of [his] Senior Level 56 MT job title." (*Id.*)

In reply, Intel notes that only work-related coursework is eligible for tuition assistance, that Anderson concedes he never submitted a formal request for tuition assistance, and that Anderson admitted his "real reason" for attending the course was to learn how to build a house.  (Doc. 53 at 4.)  Intel concludes that Anderson's "argument that he later applied the skills learned in this coursework to his job . . . does not convert this issue into an adverse employment action." (*Id.*)

b.   **Analysis**

Intel seems to argue that the denial of an employee's request for tuition reimbursement cannot, as a matter of law, ever constitute an adverse employment action. This argument is difficult to reconcile with the Ninth Circuit's observation that "[a]dverse employment actions may include not only actions an employer affirmatively takes against an employee (e.g., firing or demoting the employee) but also situations in which the employer denies an employee a material benefit or opportunity that was otherwise available." *Campbell*, 892 F.3d at 1013.  Indeed, many courts have concluded that the denial of an application for tuition reimbursement may form the basis for a Title VII claim. *See, e.g.*, *Sundaram v. Brookhaven Nat'l Labs.*, 424 F. Supp. 2d 545, 579 (E.D.N.Y. 2006); *Johnson v. Bd. of Johnson Cnty. Comm'rs*, 37 F. Supp. 2d 1273, 1282 (D. Kan. 1999).  *But see Beckham v. Nat'l R.R. Passenger Corp.*, 736 F. Supp. 2d 130, 146-48 (D.D.C. 2010) (denial of tuition reimbursement did not affect the terms or conditions of employment).

Nevertheless, even assuming that the denial of a tuition reimbursement request could provide the predicate for a Title VII claim, Anderson's claim here fails for the simple reason that he never actually applied for tuition reimbursement.  *Cf. Campbell*, 892 F.3d at 1014 ("Campbell [n]ever availed herself of the established channels through which she

might have been able to receive a transfer.  The failure to give Campbell what would essentially have been a gratuitous accommodation was not an adverse employment action.").  It is undisputed that Intel requires employees seeking tuition reimbursement to obtain manager approval (because the funds for tuition reimbursement are diverted from the department budget).  Westall would have been the one to approve or deny Anderson's request for reimbursement, and it is undisputed that he never submitted a request to her.  It is also undisputed that Intel encourages employees to submit an EAF before formally requesting reimbursement, but Anderson did not submit an EAF.  Because Anderson did not follow Intel's prescribed procedures to request tuition reimbursement, he did not suffer an adverse employment action.  *Campbell*, 892 F.3d at 1013-14.  *See also Kowitz v. City of Portland*, 2019 WL 542271, *4 (D. Or. 2019) (granting summary judgment to employer on Title VII claim that was premised in part on the "denial of tuition reimbursement" because the plaintiff's discussions of tuition reimbursement were "merely aspirational and were never concrete or even presented to Defendant" and thus "there was no adverse action taken relating to future classes or tuition" or even an "action taken at all"); *Lawrence v. Schuylkill Med. Ctr. E.*, 2012 WL 3536978, *22 (M.D. Pa. 2012) (granting summary judgment to employer on Title VII claim that was premised in part on the employer's "failure to timely provide Plaintiff with tuition reimbursement" because the plaintiff did not comply with the employer's temporal requirements for seeking tuition reimbursement and such non-compliance "eliminates her inference that she was entitled to reimbursement when she completed the course"); *Brown v. Ga. Lottery Corp.*, 2008 WL 11333446, *12 (N.D. Ga. 2008) (granting summary judgment to employer on Title VII claim that was premised in part on the discontinuation of tuition assistance for online classes held over the lunch hour because the plaintiff "had not complied with the requirements of the tuition reimbursement program by getting prior approval" and no "reasonable jury would find that being required to follow the rules of the reimbursement program constituted a materially adverse action").

…

4.   Invention Disclosure Form

a.   **Parties' Arguments**

Intel argues that Anderson cannot assert a Title VII claim premised on the denial of his request for an invention because, although DeFrancis initially denied his request, DeFrancis later changed course and approved it.  (Doc. 44 at 12.)  Intel contends the initial denial was "by mistake" but argues that even assuming it was intentional, Anderson suffered no adverse action in light of the ultimate approval.  (*Id.*)

In response, Anderson concedes that "the fact that Intel ignored [his] requests for Invention Incentive may not be adverse in itself" but argues that Intel "should be held responsible and accountable for continuing to withhold [his] compensation and invention incentives for works completed . . . above and beyond the pay grade of a Senior Level 56 MT."  (Doc. 52 at 15.)  He cites *Davis v. New York City Department of Education*, 804 F.3d 231 (2d Cir. 2015), which he argues "rejected the argument that the denial or reduction of a discretionary bonus is categorically insufficient to constitute an adverse employment action."  (*Id.* at 15-16, internal quotation marks omitted).

In reply, Intel notes that DeFrancis approved the second request "within days" of the initial request, argues there is no evidence that Anderson lost any compensation based on the initial denial, and asserts that any claim for lost compensation would be time barred. (Doc. 53 at 4-5.)

b.   **Analysis**

As noted, "[a]dverse employment actions may include not only actions an employer affirmatively takes against an employee (e.g., firing or demoting the employee) but also situations in which the employer denies an employee a material benefit or opportunity that was otherwise available."  *Campbell*, 892 F.3d at 1013.  Nevertheless, an adverse employment action still must be "one that materially affect[s] the compensation, terms, conditions, or privileges of . . . employment."  *Davis*, 520 F.3d at 1089 (alterations in original) (internal quotation marks omitted).

Here, no reasonable juror could find, based on the evidence proffered by the parties

at summary judgment, that the initial denial of Anderson's request for an invention incentive amounted to an adverse employment action. Even assuming that it could be an adverse employment action for an employer to deny such a request, Intel quickly granted Anderson's request upon resubmission. There is zero *evidence* in the record—as contrasted with the unsupported *arguments* in Anderson's response brief—that Anderson's compensation, terms, conditions, or privileges of employment were affected by this temporary denial. Nor has Anderson identified any similarly-situated individual who was treated differently.

### 5. Recertification

#### a. **Parties' Arguments**

The final category of challenged conduct giving rise to Anderson's Title VII discrimination claim is Intel's imposition of various "recertification" requirements upon his return to work in July 2016. Intel does not appear to dispute that the imposition of these requirements constituted an adverse employment action—it does not, for example, address these requirements in the portion of its motion explaining why the other four categories of challenged conduct (written warning, laptop, tuition assistance, invention incentive) were not adverse actions. (Doc. 44 at 8-13.) Instead, Intel argues that Anderson cannot premise his Title VII claim on the recertification requirements because it had legitimate, non-discriminatory reasons for imposing them. (*Id.* at 14.) More specifically, Intel contends that it has "shown that re-integration of an employee to work requires review of their certifications, and supervisors are expected to develop a plan to have the employee retrained and recertif[ied]." (*Id.*)

Anderson's only response is that he was "engaged in protected FMLA Intermittent Leave, but this did not stop DeFrancis's repeated harassment about the timeliness of [his] recertification process, despite the lack of a clear plan from the supervisor and that [his] ADA qualifying medical condition created the need for [him] to have a more flexible schedule accommodations at the time." (Doc. 52 at 17.)

Intel replies that Anderson's proffered evidence "only proves that the proposed

1   schedule was a guideline" and that it "had a legitimate, nondiscriminatory reason for

2   wanting to see measurable progress toward recertification," which was "just ordinary work

3   management." (Doc. 53 at 6-7.) Intel concludes that Anderson has provided "no 'specific'

4   and 'substantial' evidence of pretext for discrimination." (*Id.* at 7.)

5                                    b.   **Analysis**

6          Intel is entitled to summary judgment on any Title VII discrimination claim

7   premised on its recertification requirements because it had a legitimate, nondiscriminatory

8   reason for imposing those requirements and Anderson has not presented any evidence that

9   the requirements were pretextual. Specifically, Intel has produced evidence that Anderson

10  "needed to be recertified to work on certain tools [when he returned from leave] because

11  his certifications had expired." (Doc. 44-4 ¶ 5.) Intel also attached a copy of its guidelines

12  for recertification (*id.* at 6) and set forth evidence establishing that "[r]e-integration of an

13  employee to work requires review of their certifications" (*id.* ¶ 6). Finally, Intel produced

14  evidence that, while Anderson was pursuing recertification, Anderson "could still perform

15  maintenance on the tools without certifications, so long as the trainer or certifier reviewed

16  his work." (*Id.* ¶ 7.) Anderson has not disputed this evidence.

17         Anderson's only response is that DeFrancis harassed him concerning his

18  recertifications and did not respect his need for a flexible work schedule due to his

19  disability. But Anderson's complaint bases his allegations that he was held to "different,

20  more strict, company standards and practices than [his] grade-level cohorts" on a violation

21  of Title VII, not the ADA. (Doc. 1.) Anderson has produced no evidence that Intel

22  escalated his recertification process as a pretext for discriminating against him on the basis

23  of his race, ethnicity, or national origin and has produced no evidence that Intel's proffered

24  reasons for requiring him to be recertified shouldn't be believed. *Celotex*, 477 U.S. at 322-

25  23.

26         …

27         …

28         …

1

### B.   Retaliation Claim

2   "Title VII's antiretaliation provision forbids employer actions that 'discriminate

3   against' an employee . . . because he has 'opposed' a practice that Title VII forbids or has

4   'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding,

5   or hearing.'" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59 (2006) (quoting

6   42 U.S.C. § 2000e-3(a)).   "Like discrimination, retaliation may be shown using the

7   *McDonnell Douglas* burden shifting framework." *McGinest v. GTE Serv. Corp.*, 360 F.3d

8   1103, 1124 (9th Cir. 2004).   To assert a prima facie Title VII retaliation claim against an

9   employer, a plaintiff must show that "(1) she had engaged in protected activity; (2) she was

10   thereafter subjected by her employer to an adverse employment action; and (3) a causal

11   link existed between the protected activity and the adverse employment action." *Porter v.*

12   *Cal. Dep't of Corr.*, 419 F.3d 885, 894 (9th Cir. 2005).   The causal link is governed by a

13   "but for" test.   *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).   If a prima

14   facie case is established, "the burden shifts to the defendant to set forth a legitimate, non-

15   retaliatory reason for its actions; at that point, the plaintiff must produce evidence to show

16   that the stated reasons were a pretext for retaliation." *Surrell v. Cal. Water Serv. Co.*, 518

17   F.3d 1097, 1108 (9th Cir. 2008).

18   Here, the complaint alleges that Intel "retaliated" against Anderson for "filing a

19   formal EEOC complaint" and that the retaliation took the form of "designating [him] for

20   wrongful termination via the Company's Involuntary Separation Package."  (Doc. 1 at 2.)

21   In its motion, Intel doesn't dispute that filing an EEOC complaint constitutes protected

22   activity but disputes (1) whether Anderson's designation for ISP was an adverse

23   employment action and (2) whether Anderson has shown a causal link between the

24   protected activity and the adverse employment action.  (Doc. 44 at 15-17.)

25   Intel is entitled to summary judgment on Anderson's retaliation claim because, even

26   assuming that designating—but not ultimately following through with terminating—an

27   employee for involuntary separation could constitute an adverse employment action for

28   purposes of a retaliation claim under Title VII, Anderson has not established the requisite

causal link.  In support of its claim that no causal link exists between Anderson's filing of the EEOC complaint and Anderson's initial inclusion in the ISP, Intel proffers evidence showing that none of "the decision-makers involved in the conduct he describes as retaliatory knew of his protected complaints" and that the "ISP was a corporatewide action based on a formula related to specific annual performance ratings," so there "is no way [Anderson's] filing a charge factored in."  (Doc. 44 at 16; Doc. 53 at 9.)  Anderson's only response is that "Intel was aware of [his] disabling illness which required reasonable accommodation" and that "[o]nce [he] filed an internal HR discrimination complaint, Westall placed [him] on disciplinary suspension and, later, DeFrancis denoted a WW which was never presented to [him] on [his] 2015 Focal, directly affecting [his] annual company rating, wrongfully qualifying [him] for the later designation for ISP termination and Intel's attempt to fire [him]."  (Doc. 52 at 19.)

The problem with Anderson's argument is it is different from the theory of liability set forth in the complaint.  As noted, the complaint alleges that Intel retaliated against Anderson for filing *an EEOC complaint*, not for filing a different internal complaint one year earlier.  Anderson has not proffered any evidence that those who designated him for inclusion in the ISP were even aware of (let alone retaliated against him because of) his filing of an EEOC complaint.  Anderson's argument that DeFrancis was biased against him and gave him an undeserved rating (which, in turn, qualified him for ISP) is thus irrelevant and insufficient to survive summary judgment, as are Anderson's other proffered arguments.  *Anderson*, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted.").

### C.   **Other Potential Claims**

#### 1.   Hostile Work Environment

Although Intel's motion seeks summary judgment "on all claims" (Doc. 44 at 17), the only claims specifically addressed in the motion are Anderson's claims for discrimination (*id.* at 8-15) and retaliation (*id.* at 15-17).  Intel does not, in contrast,

specifically address whether there is sufficient evidence to support a hostile work environment claim.  In response, Anderson suggests, albeit somewhat obliquely, that he was subjected to "an ongoing hostile work environment . . . from April 2013 through . . . May 14, 2014." (Doc. 52 at 16.)  In reply, Intel argues that (1) the Court should disregard this reference because "there is no hostile work environment claim" in the complaint, and alternatively (2) it is entitled to summary judgment on any hostile work environment claim "for the same reasons" it is entitled to summary judgment on Anderson's discrimination claim.  (Doc. 53 at 9.)

The Court disagrees with Intel that Anderson has not asserted a hostile work environment claim.  The complaint alleges that Intel "discriminated against [Anderson] based on [his] race, ethnicity and national origin by creating a hostile work environment *and* by holding [him] to different, more strict, company standards and practices than [his] grade-level cohorts." (Doc. 1 at 1-2, emphasis added.)  Pleadings, particular pleadings filed by *pro se* litigants, are to be construed liberally.  *Weilburg v. Shapiro*, 488 F.3d 1202, 1205 (9th Cir. 2005); *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1070-71 (9th Cir. 2004) (holding district court erred in "overlooking . . . allegations of direct constitutional violations under the First and Fourteenth Amendment" because the complaint, "liberally construed, raise[d] [the] claims").  Construed liberally, the complaint alleges that Intel subjected Anderson both to a hostile work environment and to specific discriminatory actions.

To the extent Intel believed the complaint failed to allege sufficient facts to state a cognizable hostile work environment claim, it could have raised such an argument in a motion to dismiss under Rule 12(b)(6).  Because it did not do so, the hostile work environment claim remains part of the case.  And because Intel's arguments seeking summary judgment on the hostile work environment claim are raised for the first time in a reply brief, those arguments are not properly before the Court.  *See, e.g., Hoard v. Hartman*, 904 F.3d 780, 792-93 (9th Cir. 2018) (reversing grant of summary judgment against *pro se* plaintiff, where movant made a "blanket request for 'complete summary judgment on all

claims'" but did not specifically address the sufficiency of one of the plaintiff's claims, because "boilerplate language requesting summary judgment on all claims does not provide sufficient notice that an unmentioned claim is at issue on summary judgment" and "pro se plaintiffs . . . cannot be expected to anticipate and prospectively oppose arguments that an opposing defendant does not make") (quotation marks omitted); *Mirlan v. Affiliated FM Ins. Co.*, 2009 WL 10671059, *6 (C.D. Cal. 2009) ("It is improper to raise in a Reply new grounds for summary judgment that were not included in the original motion for summary judgment because it deprives the nonmoving party of an opportunity to address them."); 2 Gensler, Federal Rules of Civil Procedure, Rules and Commentary, Rule 56, at 170 (2021) ("Moving parties are expected to put all of their arguments . . . in the opening brief, giving the other side clear notice of what it needs to address in its response.").

The Court will nevertheless permit Intel to file a successive motion for summary judgment on the hostile work environment claim.   Under the circumstances, it is understandable that Intel could have construed Anderson's less-than-precise complaint as asserting only discrimination and retaliation claims.  *Hoffman v. Tonnemacher*, 593 F.3d 908, 911 (9th Cir. 2010) (holding that "district courts have discretion to entertain successive motions for summary judgment" and noting that "allowing a party to file a second motion for summary judgment" can be "logical" and "foster[] the 'just, speedy, and inexpensive' resolution of suits") (quoting Fed. R. Civ. P. 1).

### 2.   Other Allegations

Intel argues that the following claims raised in Anderson's summary judgment papers were not asserted in the complaint and should be disregarded: (1) allegations of a federal or California WARN Act violation; (2) allegations of FMLA leave interference; (3) retaliation by denying requests for reasonable disability accommodations; and (4) allegations that Intel offered IRP because it would not accommodate his disability with a job transfer.  (Doc. 53 at 10-11.)

Even affording Anderson the benefit of the doubt and construing his complaint with liberality, the Court agrees with Intel that these claims are not properly part of this case.

Courts generally "will not consider a new claim raised for the first time in response to a motion for summary judgment.  Nevertheless, a plaintiff proceeding *pro se* should be afforded the benefit of any doubt in ascertaining what claims he raised in his complaint and argued to the court in his later filings." *Hardy v. 3 Unknown Agents*, 690 F. Supp. 2d 1074, 1083 n.1 (C.D. Cal. 2010) (citation omitted).  Rule 8 "requires that the allegations in the complaint give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (internal quotation marks omitted).

Anderson did not mention (let alone allege a violation of) either the California WARN Act or the FMLA in his complaint.  And although Anderson invoked the ADA in the "Jurisdiction" section of the complaint, he did not allege any violations of the ADA in the body of the complaint.  (Doc. 1 at 1.)  Instead, Anderson merely noted that he was on medical leave under the ADA at the time Intel allegedly retaliated against him for filing an EEOC complaint.  (*Id.* at 2.)  At no point did Anderson provide notice to Intel that he was claiming it failed to provide reasonable accommodations to him or retaliated against him for seeking reasonable accommodations.  Permitting these new claims and theories of relief at this relatively late stage of the case would prejudice Intel, which answered the complaint and completed the discovery process based on the understandable belief that the claims and theories asserted in the complaint were Anderson's only claims and theories in this action. *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292-93 (9th Cir. 2000) ("A complaint guides the parties' discovery, putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations. . . .  After having focused on [one theory] in their complaint and during discovery, the [plaintiffs] cannot turn around and surprise the [defendant] at the summary judgment stage on the theory that an allegation of [one theory of relief] is sufficient to encompass a[nother] theory of liability.").

Anderson could have requested leave to amend his complaint to add these claims and theories of relief, but because he did not, he cannot raise them now.  *Pickern*, 457 F.3d at 968-69 (district court did not err by holding that new allegations raised in response to

motion for summary judgment failed to provide adequate notice to defendants); *Coleman*, 232 F.3d at 1294 (district court did not err in "not allow[ing] [plaintiffs] to proceed on" a theory of liability raised "for the first time at summary judgment"). *Cf. Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006) ("[T]he necessary factual averments are required with respect to each material element of the underlying legal theory. . . . Simply put, summary judgment is not a procedural second chance to flesh out inadequate pleadings.") (alterations in original) (internal quotation marks omitted).

Accordingly,

**IT IS ORDERED** that Intel's motion for summary judgment (Doc. 44) is **granted in part and denied in part**. The sole remaining claim in this action is Anderson's claim for a hostile work environment.

**IT IS FURTHER ORDERED** that Intel may file a successive motion for summary judgment as to Anderson's hostile work environment claim within 30 days of this order.

Dated this 22nd day of March, 2021.

Dominic W. Lanza
United States District Judge